IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2007

**STATE OF TENNESSEE v. DON SANDERS**

**Appeal from the Criminal Court for Shelby County**
**No. 03-08239     W. Mark Ward, Judge**

_____

**No. W2006-02592-CCA-R3-CD  - Filed April 22, 2008**
_____

The Appellant, Don Sanders, appeals his conviction by a Shelby County jury for the first degree murder of Marilyn Hughes.  On appeal, Sanders argues that, because he suffers from a mental illness, the evidence is insufficient to establish that he possessed the mental capacity to premeditate the murder of the victim.  Following a review of the record, we conclude that the evidence is legally sufficient to support his conviction.  Accordingly, the judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Robert Wilson Jones, Shelby County Public Defender; Garland Ergüden, Assistant Public Defender (on appeal); Sherrye Brown and Constance Barnes, Assistant Public Defenders (at trial), Memphis, Tennessee, for the Appellant, Don Sanders.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles Bell and Pamela Fleming, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Factual Background**

Jessie Richardson, the brother of the victim, Marilyn Hughes, testified that the Appellant dated the victim for about three years and that the couple lived together with the victim's three children.  In addition to the victim's three children, the Appellant and victim had a child together, Don, Jr., who was one year old on the date of the crime.  In describing the relationship, Richardson said that the couple sometimes argued but that they appeared to have a stable relationship. Richardson said that the victim worked at a retirement home and that the Appellant stayed home and took care of the children.  Richardson recalled that the Appellant received "some kind of check," part

of which he contributed to the household. He stated that the victim did not discuss the Appellant's mental health with him, but she had told him that the Appellant "was on medication at Midtown Mental Health [Center]" in Memphis.

Richardson stated that he saw the Appellant and the victim socially during the week prior to the victim's death, and he noticed nothing unusual about the Appellant's behavior. The last time Richardson spoke to the victim was when she called Richardson on Saturday, March 15, 2003, and invited him to the Appellant's mother's house for a gathering, which Richardson did not attend. Upon later learning of the victim's death, Richardson went to her house, where he saw that an ambulance was present and the Appellant was in police custody. Richardson also learned that the couple's young son had been rushed to the hospital due to dehydration and "burns." Richardson stayed at the scene until the victim's body was brought out, and then he went to the hospital to check on Don, Jr. Richardson testified that the young child appeared to have grease marks on his face and body, permanent scars on his arm, and two deep bruises.

Margaret Threat testified that she had been a best friend and co-worker of the victim since 1996. Threat stated that she met the Appellant, whom she knew by the nickname of "Pimp," approximately two years prior to the death of the victim. Threat testified that she last saw the victim on Saturday, March 15, 2003, when Ms. Hughes had stopped by her house to briefly talk to her in the driveway of her home. Threat and the victim planned to travel together to the wedding of a co-worker the next day.

Threat testified that she telephoned the victim around 10:00 a.m. on Sunday, March 16, but her call was not answered. When Threat called again, the Appellant answered the phone and said that Ms. Hughes was not at home. Threat then drove by the victim's home on her way to the store, and she saw the victim's car parked in the driveway. When Threat returned to her house, she answered a telephone call from the Appellant, who told Threat, "that he had killed [Ms. Hughes], poured grease and killed her." Threat did not take the Appellant seriously, telling the Appellant to "put [Ms. Hughes] on the phone and stop playing." Threat said that the Appellant then hung up. Threat testified that she did not learn of the victim's death until later in the week. Threat stated that prior to these events, there was nothing unusual about the Appellant's behavior. She stated that she was aware that the Appellant was on medication, because she once drove him to a mental health center for treatment.

Marquela Kelly, one of twin daughters of the victim, testified that she was eight years old at the time of her mother's death. She testified that on Saturday, March 15, 2003, she and her twin sister, their brother, the victim, the Appellant, and Don, Jr. went to the Appellant's mother's house for a visit. Marquela testified that the Appellant and the victim got into a fight while they were at the Appellant's mother's house. When the group arrived home at about 11:00 p.m. on Saturday night, she and the other children of the victim sat in the living room and watched television, and the Appellant went to the bedroom with the victim and Don, Jr. Marquela testified that she fell asleep watching television.

Marquela testified that she awoke at about 6:00 a.m. on Sunday, when the victim "ran into the living room screaming and to tell [the children] to call the ambulance" with Don, Jr. running behind her. Marquela stated that the victim had bruises on her body and was wearing a bra and underwear. The Appellant then came into the living room and said "go back in the room and I will call the ambulance." The victim then returned to the bedroom, followed by the Appellant and Don, Jr. Marquela testified that she went to the hallway to locate the telephone, but it was not there. She also went to see if the key was in the front door, which it was not. Marquela testified that she went back to sleep, because she did not hear anything else and thought that her mother was "ok." She and her sister and brother awoke later on Sunday, made something to eat, and watched television. At some point, the children began to argue about the television channel, and the Appellant came into the room, got the remote control, and changed the channel to a movie channel. Marquela stated that the Appellant "looked like he always looked." As the Appellant walked back into the bedroom, Marquela noticed that he had two kitchen knives in his back pockets. She testified that the Appellant's brother came to the door later, asking where the Appellant was, and she responded that she did not know. The children went to sleep, awoke on Monday morning, and realized they were in the house alone. Marquela said that she heard Don, Jr. crying, but he did not appear to be in the house. She recalled that the key was in the front door and that she opened it and saw their neighbor, James Moore, talking to a friend outside. The children beat on the door and notified Moore that they were home alone, and he took them next door to his house.

James Moore, the neighbor of the victim and the Appellant, also knew the Appellant as "Pimp" and had played basketball with him on occasion. He testified that he saw the victim's children beating on the front door of their home, trying to get his attention. Moore walked to the door and asked what was wrong, and the children said that nobody was home with them. The children then indicated to Moore that the victim and the Appellant had gone to the hospital. Moore and his friend, John Covington, noticed "little specks" of blood on the wall of one of the rooms in the home. To keep the children calm, Moore then took them to his house, where he gave them something to eat and let them watch television.

Moore testified that he and Covington then went back to the victim's house to look for Don, Jr. While walking in the backyard, Moore noticed the Appellant in the area of a vacant house next door. Moore stated that the Appellant was holding Don, Jr. on his shoulder, patting the child. Moore and his friend approached the Appellant and spoke to him. Moore said that the Appellant, who was usually talkative, "kind of held back . . . kind of like he didn't want to say anything" to them. Moore asked the Appellant if the child was "ok," and the Appellant responded that the child was "ok" and "that everything was going be all right." Moore recalled that the Appellant had a couple of scars on his face and some bruises. Moore invited the Appellant to bring the child to his house, but the Appellant did not respond. Moore's friend, Covington, became distressed by the situation and went home. Moore returned to the victim's house to find the child's mother. Upon entering the bedroom, he discovered "a lot of blood on her bed and blood on the wall," and, in a mirror reflection, he saw the victim lying naked and bloody with "a lot of burn marks." The police were summoned to the scene, and they arrived within thirty or forty minutes.

Officer Delbert Polk, of the Memphis Police Department, testified that he and his partner responded to a call to the victim's house in Memphis. Officer Polk walked to the rear of the vacant house next door, where he saw the Appellant, who was wearing a "blue jean sort of outfit" and holding a child while sitting on the rear stoop. Officer Polk identified himself, but the Appellant never looked at him and had a "blank stare" straight ahead. As Officer Polk approached at a wide angle, he asked about the child, and the Appellant only responded in "one or two words," never looking at him. Eventually, after about twenty or thirty minutes, with the assistance of a female paramedic, the Appellant's hold on the child was loosened enough that the child could be removed from his arms. Officer Polk maintained his grasp of the Appellant, detained him, and searched his person, finding a knife in the Appellant's rear pants pocket but no blood residue was apparent. Officer Polk also found another knife in the area. He handcuffed the Appellant and placed him in the back of a police car. Officer Polk testified that the homicide investigator advised him to take the Appellant to the "Med."

Lieutenant Mark Miller, of the Memphis Police Department, was assigned to the homicide investigation unit in March of 2003, and he testified that he documented the exterior of the crime scene. Miller further testified that he spoke with the Appellant the next day in the interview room of the homicide unit. The Appellant initially indicated that he wanted a glass of water, and Lieutenant Miller sent two other investigators into the room with the water. The investigators came out of the room and said that the Appellant was not responsive to questioning. Lieutenant Miller went back into the interview room and, upon questioning, received only "a slight response" when he asked about the Appellant's child's nickname and date of birth. He asked the Appellant about any other dates he remembered, and the Appellant mentioned March 7. Lieutenant Miller said that the Appellant had what appeared to be burn marks on his face and left arm. As Lieutenant Miller and another officer escorted the Appellant back to his jail cell, Miller asked the Appellant if he had anything he would like him to relay to Don, Jr. He recalled that the Appellant told him "to tell his son to remember the things they had done together."

Dr. O.C. Smith, a forensic pathologist, testified that he served as Shelby County Medical Examiner from 1999 to 2004, and he described the scene at the home of the victim. Dr. Smith stated that the victim's body was found on the floor of the bedroom beside the bed and an outside wall. Dr. Smith stated that the room was "in quite a bit of disarray," noting that blood and an "oily substance" was found on the bedclothes, on an outside wall of the room, and covering an area where the victim was lying. The mattress of the bed in the room had "very dark colored blood" stains, which he described as indicative of having been exposed to heat. A cooking pot was found in the bedroom, and its lid was found in the kitchen, as was a bottle of cooking oil.

Dr. Smith testified that he performed an autopsy of the victim with Dr. Terry Campbell. Dr. Smith opined that the victim died as a result of multiple injuries, specifically multiple stab wounds and burns of the second and third degree. He stated that the victim had six surface stab wounds and two internal wounds, the most devastating of which affected the victim's left jaw and upper neck region (carotid artery), the mid-upper chest and collar bone, and the right-upper chest of the victim (jugular vein). Dr. Smith testified that second and third degree burns covered 44 percent of the

victim's body, specifically her torso and upper and lower extremities. He noted the existence of cuts and bruises to the hands of the victim and her broken artificial fingernails. Dr. Smith opined that, based upon burn patterns, the victim likely sustained the burn injuries while in a seated position. He further opined that the stab wounds had been inflicted first, with exposure to hot liquid occurring afterwards. Dr. Smith testified that he believed the victim was alive when hot cooking oil was thrown onto her.

Patti Macken, a paramedic for the Memphis Fire Department, was called as a witness for the defense, and she testified that she arrived at the victim's house on March 18, 2003, and assisted police in their approach of a man holding a child at the vacant property next door. Macken described the man as having "a catatonic type state of stare." Macken testified that she was able to remove the small child from the man's arms after about twenty minutes. Macken took the child, who had "little burn spots" on his chest, arm, and leg, to an ambulance which transported the child to the hospital.

Dr. Sam Craddock, a defense witness, testified that he is a psychologist at the Forensic Services Division of the Tennessee Department of Mental Health in Nashville. Dr. Craddock further testified that the Appellant was referred to his facility on May 13, 2003, and remained for a period of twenty-nine days for evaluation purposes. He met with the Appellant on ten different occasions during this period, and he also observed the Appellant's behavior while in the residential unit. Explaining his findings from his first evaluation of the Appellant, Dr. Craddock testified:

> It was our impression from speaking with [the Appellant's] family that he had been deteriorating mentally in the days preceding the incident that led to his arrest, but we did not think that his mental condition was so severe that he would not be able to appreciate the wrongfulness of what he had been accused of. Therefore, we didn't find a basis for an insanity defense. There are two components there, that the person has to be severely mentally ill as well as they have to be so mentally ill where as a result of their mental illness that they cannot appreciate the wrongness of their actions or comprehend maybe the nature of their act is the other part. But nonetheless, we thought that he was, even though mentally ill, he understood the wrongfulness of his alleged act. So we did not support insanity defense. We thought that he was manipulating us. He was being uncooperative. And that he could have been making a better effort during testing with me and during interviews and we gave him a diagnosis of malingering, which is essentially being uncooperative and trying to embellish upon one's disability and present one's self as more disabled than they actually are. And we thought he was competent to stand trial.

Dr. Craddock testified that, during the Appellant's initial stay at his facility, he possessed very little information from the referring mental health center, Midtown Mental Health Center, in Memphis, regarding the Appellant's mental history, although he noted in his diagnosis that he was aware that the Appellant had a history of severe mental illness, based upon discussions with the Appellant's family members and with the referring evaluators in Memphis. However, Dr. Craddock stated that, during this first evaluation, he and other doctors "did not see genuine features that convinced [them]

that [they] weren't looking at somebody who was just simply just trying to deceive [them]." He testified that the Appellant was nonetheless prescribed anti-psychotic medication when he was returned to custody in Shelby County, and he and an attending psychiatrist, Dr. Farouk, recommended that the Appellant receive this medication and "followup services."

Dr. Craddock recalled that, during this first evaluation period, the Appellant provided him with a number of different versions of what transpired at the time of the victim's death. In his first account, the Appellant stated, "they say their momma and I got into it over the baby." Another explanation provided by the Appellant was that the victim "went into the kitchen and came out with a pot and tried to throw grease on [the Appellant] and it got on her and she came back with a knife and [the Appellant] got behind her and she tried to stick [the Appellant] and she stuck herself and fell on the bed." In a third account, the Appellant claimed that the victim had "tried to put grease on [the Appellant] and the baby and [the Appellant] pushed her on the bed and grease went on her[,]" and that the victim obtained a knife and stabbed herself after "swinging wildly" at the Appellant during a struggle. Finally, the Appellant offered a fourth explanation:

> The grease was popping and saying, the grease saying, yeah, do the right thing, get her. . . . I saw my baby behind me and went to grab him and I thought she had a gun, too, and always kept the window closed, so I went back in the kitchen and asked, is this what you had for me. Grease got on me.

Dr. Craddock testified that the Appellant returned to the mental health facility in Nashville, pursuant to court order, for a twenty-eight day period beginning on March 31, 2004. Dr. Craddock said this evaluation was ordered based upon reports that the Appellant was "not functioning well in jail," and it was recommended that the Appellant be reassessed for the purposes of determining his competence to stand trial, his present mental condition, and his need for continued medication. He testified that when he met this time with the Appellant, the Appellant was not in the same condition as his initial visit and that he "saw somebody who was of questionable competence." Dr. Craddock said that the Appellant's thinking appeared to be confused and his judgment poor, and these and other symptoms convinced him and the other evaluators that they were seeing more genuine symptoms of mental illness than they had seen during his initial visit. At the end of this second visit, Dr. Craddock found the Appellant incompetent to stand trial, and he was diagnosed with "schizophrenia, undifferentiated type." Dr. Craddock also testified that he and Dr. Farouk were ordered by the trial court to provide an assessment of the Appellant's mental condition at the time of the offense, which he summarized as follows:

> And with [the Appellant] and from the description of his behavior that we had at the time of the incident, and [the Appellant's] mental illness, it was Dr. Farouk and my opinion that his ability to employ judgment and to reflect upon the likely consequences of his actions was impaired. It was diminished. To say it was completely removed, that he had no ability to do that. I can't say that. But was it – was his ability as good as somebody as again as perhaps mine or yours would be, a person that does not have a mental illness, no I think it was diminished.

-6-

Dr. Craddock testified that at the time of this second evaluation in 2004, he possessed more information about the Appellant's prior mental history than he had during the Appellant's initial visit in 2003. This information was gathered from the Appellant's brother and mother, as well as records from Midtown Mental Health Center in Memphis, where the Appellant had received monthly injections of Halodol, an anti-psychotic medication, for several years prior to 2003. The Memphis medical report demonstrated that in the week preceding the death of the victim in March of 2003, the Appellant had discontinued his monthly injection of anti-psychotic Halodol medication because he "wanted to go on pills." This was in response to the Appellant's indication to doctors in January of 2003 that he wanted to switch medications to a pill form of medication, which Dr. Craddock identified as Zyprexa, because of adverse side effects of the injectable Halodol, which Dr. Craddock identified as "things that make you look abnormal" such as "tongue movement." Dr. Craddock testified, however, that after the death of the victim, the Appellant was prescribed Zyprexa during his first evaluation in Nashville in May of 2003, and that he did not observe any symptoms that would lead to a diagnosis of psychosis or schizophrenia.

Additionally, Dr. Craddock was later requested to determine whether, on the date of the victim's death, the Appellant's mental capacity was diminished to the extent that he would have been unable to premeditate the murder of the victim. Dr. Craddock related that it was the "consensus opinion" of the forensic team that the Appellant's "ability to premeditate was sufficiently impaired by his mental illness [of schizophrenia] that he was unable to act with any substantial reflection or judgment."

Notwithstanding this opinion, at trial, Dr. Craddock responded as follows to questioning by the State regarding the Appellant's capacity for premeditation at the time of the death of the victim:

Q.     You don't really know what his capacity was at that moment in time when you weren't there? But it's what you believe may have happened?

A.     Yeah. We're giving an opinion to the Court. It's not fact and it's merely our impression and it's for the jurors to decide really. But we're telling the Court what we found in a way of a mental illness, how the mental illness may have played into the person's functional abilities, capacities at the time. Whether it's toward a diminished capacity or insanity criteria.

Q.     Okay. So you're not saying that [the Appellant] completely had an inability to premeditate?

A.     Not at all.

Based upon the evidence at trial, a jury found the Appellant guilty of first degree murder. The trial court sentenced the Appellant to life imprisonment and entered judgment on the conviction on November 3, 2006. The Appellant filed a motion for new trial, which the trial court denied by order on December 1, 2006. The Appellant timely filed a notice of appeal.

**Analysis**

The Appellant challenges the sufficiency of the evidence supporting his conviction for first degree murder based upon a premeditated and intentional killing of another.

In our review of the issue of sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as triers of fact. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1994). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is statutorily defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2003). An act is premeditated if the act is "done after the exercise of reflection and judgment." *Id.* at (d). In other words, the "intent to kill" must have been formed prior to the act of murder itself. *Id.* Additionally, it is not necessary that the purpose to kill pre-exist in the mind of the accused for a definite period of time. *Id.* "The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The Appellant contends that the evidence at trial, when tested against the standards enunciated by *Jackson v. Virginia* and Rule 13(e) of the Tennessee Rules of Appellate Procedure, is insufficient to show that the killing of Marilyn Hughes was an intentional and premeditated murder. He argues that "[a]ll the evidence fairly pointed towards one rational conclusion – a catastrophic change in [the Appellant's] medication regime which in turn led to a psychotic break and Marilyn Hughes' tragic death." The Appellant asserts that the medical proof regarding his history of serious mental illness, particularly previous diagnoses of schizophrenia and Dr. Craddock's opinion that his capacity to form premeditation was diminished, was so overwhelming that no rational juror could have found him capable of acting with premeditation.

It is firmly established that a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that "no person may be convicted of an offense unless . . . the culpable mental state required is proven beyond a reasonable doubt." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997); *see also* T.C.A. § 39-11-201(a)(2) (2003). Evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense. *State v. Abrams*, 935 S.W.2d 399, 402 (Tenn. 1996); *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). A defendant may not be convicted of first degree premeditated murder if, as the result of a mental disease or

defect, he or she lacked the capacity to form premeditation. *State v. Holder*, 15 S.W.3d 905, 913 (Tenn. Crim. App. 1999) (citing *Hall*, 958 S.W.2d at 690). The concept of diminished capacity recognizes that a defendant may present expert, psychiatric testimony "aimed at negating the requisite culpable mental state" of an offense. *State v. Perry*, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999) (quoting *Hall*, 958 S.W.2d at 688). In modern application, diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser-included offense. *Hall*, 958 S.W.2d at 688.

Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). Our supreme court has identified numerous circumstances that may support a finding of premeditation, including, but not limited to: declarations by the defendant of the intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the trier of fact may infer premeditation. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Despite Dr. Craddock's opinion that the Appellant's capacity to form premeditation was diminished at the time of the killing of Ms. Hughes, the jury was not required to accept the expert testimony to the exclusion of the other evidence presented in the case. *See State v. Nesbit*, 978 S.W. 2d 872, 886 (Tenn. 1998); *Holder*, 15 S.W.3d at 912 (Tenn. Crim. App. 1999). Dr. Craddock also testified that he was of the opinion that the Appellant was not "completely" incapable of premeditating the murder of the victim. Inconsistencies in the testimony of a witness are resolved by the trier of fact. As instructed by the trial court, the jury was free to believe all, none, or part of any person's testimony. Applying several of the factors elicited in *Bland* to the circumstances of the killing of the victim, it is clear that a rational juror could have found the essential elements of premeditated first degree murder. Regarding the procurement of a weapon, the victim's young daughter testified that on Sunday, March 16, the Appellant came into the living room with two kitchen knives visible in his back pockets. As to the use of a deadly weapon upon an unarmed victim, there was no indication at trial that Ms. Hughes ever armed herself while she and the child were in the bedroom with the Appellant. Regarding the particular cruelty of the killing and the infliction of multiple wounds, both of these factors are demonstrated by the testimony of witnesses for the State and photographs of the murder scene. This proof established that the victim died as a result of multiple stab wounds, as well as second and third degree burns affecting 44 percent of her body. The proof further established that, while alive, hot cooking oil was thrown onto the victim after the stab wounds were inflicted.

Additionally, the victim's daughter testified that she awoke to the victim screaming for an ambulance on Sunday, March 16, 2003, and that the Appellant went with the victim and their child back into the bedroom where the victim's body was later found. The victim's friend, Margaret Threat, received a telephone call by the Appellant on the same day, after her unsuccessful attempts to reach the victim, in which he admitted killing the victim and "pour[ing] grease on her[.]" A cooking pot was also found in the bedroom of the home, and its lid and a bottle of cooking oil were found in the kitchen. The police found the Appellant in the possession of one knife, in the vicinity of another knife, and his arms and face were affected by visible burn scars.

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was legally sufficient to support the Appellant's conviction for first degree murder. Accordingly, the Appellant's argument on appeal is without merit.

**CONCLUSION**

Based upon the foregoing, the judgment of the Shelby County Criminal Court is affirmed.

_____
DAVID G. HAYES, JUDGE

-10-